# ALAN SHAW v. STATE.

No. A-10083.   Feb. 17, 1943.
Rehearing Denied May 19, 1943.
(134 P. 2d 999; 138 P. 2d 136.)

272

274

George Croom, of Tulsa, Stanley Belden, of Cushing, and Herman Rosenfeld and Samuel A. Neuburger, both of New York City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis R. Morris, Co. Atty., and John Eberle, Asst. Co. Atty., both of Oklahoma City, for defendant in error.

Arthur Garfield Hays and Joseph A. Klausner, both of New York City, for American Civil Liberties Union.

John Lee Smith, of Throckmorton, Tex., and Sam S. Gill, of Oklahoma City, for Knights of Pythias.

Osmond K. Fraenkel, of New York City, for National Lawyers Guild.

Abraham J. Isserman, of Newark, N. J., and Nathan Witt, of New York City, for National Federation for Constitutional Liberties.

Ralph B. Gregg, of Indianapolis, Ind., and Fred A. Tillman, of Pawhuska, for American Legion.

JONES, P. J. The defendant, Alan Shaw, alias Alan Lifshutz, was charged by an information filed in the district court of Oklahoma county with criminal syndicalism, was tried, convicted, and sentenced to serve ten years' imprisonment in the State Penitentiary and to pay a fine of $5,000, and has appealed.

This prosecution is an outgrowth of an investigation conducted by the police department of Oklahoma City and culminating in a series of raids conducted in August and

September, 1940. Charges under the various sections of the criminal syndicalism statute (21 O. S. 1941 § 1263) were instituted against defendant and others. This is one of the so-called "membership" cases, so named to distinguish them from those cases where the accused were charged with selling, circulating and distributing literature advocating criminal syndicalism. The contention of the state herein is that membership in an organization, where such organization advocates forcible revolution and violent overthrowing of the existing government, is an offense under the criminal syndicalism laws of Oklahoma, regardless of whether any overt acts are actually committed by the accused or the organization itself in promoting these principles.

The typewritten record is voluminous. In addition, a large number of books and pamphlets were admitted in evidence and transferred to this court intact as an appendix to the typewritten case-made. A great number of briefs on the various points of law have been filed by friends of the court for and against the conviction.

It is first argued that the statute is defective on its face and a conviction under it a violation of the due process clause of the Fourteenth Amendment to the Federal Constitution and of the Bill of Rights of the Constitution of this state.

The information filed against the defendant, omitting formal parts, is as follows:

"On the 17th day of August, A.D., 1940, and prior to the filing of this Information, in Oklahoma County, State of Oklahoma, Allen Shaw alias Allen Lifshutz whose more full and correct name is to your informant unknown, then and there being, did then and there wilfully, unlawfully and wrongfully and feloniously commit the crime of Criminal Syndicalism in manner and form as follows

to wit: That is to say, the said defendant in the county and state aforesaid, and on the day and year aforesaid, then and there being, did then and there become and was a member, and did knowingly, and voluntarily assemble with and was then and there a member of a Society and an assemblage of persons, viz., The Communist Party, a more full and complete description of which is unknown to your informant, being a Society and an assemblage of persons, which teaches, advocates and affirmatively suggests the doctrine of criminal syndicalism, sabotage, and the necessity, propriety and expediency of doing acts of physical violence, and the commission of crime, and unlawful acts, as a means of accomplishing and effecting industrial and political change and revolution; and which Society did then and there recruit members, collect dues, collect and expend money, keep records, issue membership cards, hold meetings and conventions and teach and suggest by word of mouth and by writings, books, pamphlets and papers, the above described doctrine of criminal syndicalism and of criminal and unlawful acts as a means of effecting industrial and poltical change and revolution, contrary to the form of the statutes in such case made and provided against the peace and dignity of the State of Oklahoma."

This contention of the defendant has been decided adversely to him by former decisions of this court. Berg v. State, 29 Okla. Cr. 112, 233 P. 497; Wear v. State, 30 Okla. Cr. 118, 235 P. 271.

The Supreme Court of the United States has held the California statute on criminal syndicalism, which is similar to ours, not violative of the Fourteenth Amendment to the Federal Constitution. Burns v. United States, 274 U. S. 328, 47 S. Ct. 650, 71 L. Ed. 1077; Whitney v. People of State of California, 274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095. In Whitney v. California, supra, it is held:

"The California Criminal Syndicalism Act, which defines 'criminal syndicalism' as 'any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change,' and declares guilty of a felony any person who 'organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism,' is sufficiently clear and explicit to satisfy the requirement of due process of law." (5th syllabus.)

"This statute does not violate the equal protection clause of the Fourteenth Amendment in penalizing those who advocate a resort to violent and unlawful methods as a means of changing industrial and political conditions while not penalizing those who may advocate a resort to such methods for maintaining such conditions, since the distinction is not arbitrary but within the discretionary power of the State to direct its legislation against what it deems an evil without covering the whole field of possible abuses." (6th syllabus.)

"The determination of the Legislature that the acts defined involve such danger to the public peace and security of the state that they should be penalized in the exercise of the police power must be given great weight and every presumption be indulged in favor of the validity of the statute, which could be declared unconstitutional only if an attempt to exercise arbitrarily and unreasonably the authority vested in the state in the public interest." (10th syllabus.)

One additional constitutional question is presented which did not arise in Berg v. State and Wear v. State,

supra. Counsel for defendant contends that the title of the statute under which the charge was brought did not contain a clear expression of its subject matter and is therefore violative of the provision of article 5, § 57 of the Oklahoma Constitution to the effect that "Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title."

The title to the act in question reads:

"An Act defining criminal syndicalism and the word sabotage; prohibiting the advocacy, teaching or suggestion thereof; and prohibiting the advocacy, teaching or affirmative suggestion of crime, physical violence, or the commission of any unlawful act or thing as a means to accomplish industrial or political ends, change, or revolution, or for profit; and prohibiting assemblages for the purpose of such advocacy, teaching or suggestions; declaring it unlawful to permit the use of any place, building, rooms or premises for such assemblages in certain cases; and providing penalties for the violation thereof; and declaring an emergency."

In State v. Laundy, 103 Ore. 443, 204 P. 958, and People v. Lloyd, 304 Ill. 23, 136 N. E. 505, 506, objections to the title of criminal syndicalism statutes of Oregon and Illinois were urged, the same as is now presented by defendant. The statutes of those states are substantially the same in wording as the statute of Oklahoma and apparently were adopted at about the same time as an aftermath of the first World War. In those two cases it was held:

"If by any fair intendment the provisions in the body of an act have a necessary and proper connection with the title, and are not incongruous with the title, or without proper connection or relation therewith, they are sufficiently covered by the title."

In the body of the opinion in State v. Laundy, supra [103 Ore. 443, 204 P. 963], it is stated:

"That portion of the statute which makes it unlawful to help to organize or to become a member of or voluntarily to assemble with a denounced society or assemblage embraces matters which are at least 'matters properly connected' with the subject. That part of the body of the act now under examination is clearly not broader than the title of the act."

The constitutional provision in question was adopted mainly to prevent members of the Legislature from concealing the true nature of a proposed law by giving it a false and misleading title. The term "subject" is to be given a broad and extensive meaning so as to allow the Legislature full scope to include in one act all matters having a logical or a natural connection. In re Powell, 6 Okla. Cr. 495, 120 P. 1022; Jackson v. State, 22 Okla. Cr. 338, 211 P. 1066. Applying the above rules of law, we do not think that the statute in question is unconstitutional because of a defective title.

It is next urged that the court erred in overruling the demurrer to the information for the reason that the allegations of the information are so vague, indefinite and uncertain as to not constitute a public offense and for the further reason that said information is duplicitous.

The information is not indefinite nor uncertain in its terms. It specifically alleges that defendant became and was a member of the Communist Party which was a society that teaches, advocates and affirmatively suggests the doctrine of criminal syndicalism and describes the method of operation of said society by alleging that it would recruit members, collect dues, keep records, issue membership cards and teach writings. books, etc.

This information follows the wording of the statute, and is sufficient to apprise the defendant of the crime with which he is charged so as to enable him to prepare

his defense thereto and to plead jeopardy against further prosecution for the same offense. It is not duplicitous. The act does not charge the defendant with circulating and displaying printed matter advocating criminal syndicalism and also the crime of becoming a member of the Communist Party, such as was done in an information condemned by this court in the case of Berg v. State, supra. The latter part of the information describes the nature of the society to which it is alleged the defendant belonged. It is not alleged that the defendant did teach, circulate or display writings, books, pamphlets, etc., but it is alleged that the society to which the defendant belonged did keep records and teach and suggest by word of mouth and by writings the doctrine of criminal syndicalism. The word "assemble," in the sense in which it is used in the information, is merely descriptive of the offense of becoming a member of the Communist Party which is the gist of the offense charged against the defendant. The demurrer was properly overruled.

It is next urged that the court committed error in admitting in evidence the books, pamphlets and other articles seized by the officers in the various raids which they made upon the Progressive Book Store, the home of Robert Wood, and the home of the defendant, for the reason that the alleged search warrants and the supporting affidavits were void and insufficient to justify a search of the premises.

There were four warrants of search and seizure used by the officers to procure most of the evidence which was used against defendant. Three of these warrants were executed on August 17, 1940, and one of them on September 6, 1940. The affidavits to procure the search warrants were on a form ordinarily used to secure a warrant to search for intoxicating liquors. In addition

to the general allegations so often found in liquor search warrants the affidavit contained this insertion: "and books, records, papers and articles which are used in and are evidence of the commission of criminal syndicalism or any other crime against the laws of the State of Oklahoma and of the United States."

Our Constitution (Bill of Rights, section 30) protects all persons against unlawful searches and seizures. An examination of the affidavits discloses that they are each positive in their terms, and the fact that it is alleged that defendant had in his possession intoxicating liquor when in fact the officers were going to his premises for the express purpose of searching for articles allegedly being used to advocate the doctrine of criminal syndicalism, does not render the same void. This court has repeatedly held that an accused may not go behind the face of an affidavit to question the truthfulness of the allegations or the source of the information of the affiant. Our duty is limited to an examination of the face of the affidavit to determine whether the facts alleged are sufficient to constitute probable cause for the issuance of a search warrant. Davidson v. State, 52 Okla. Cr. 305, 4 P. 2d 131; Ward v. State, 47 Okla. Cr. 238, 287 P. 735; Hamil v. State, 46 Okla. Cr. 1, 283 P. 803.

Here the affidavits are positive in their terms in accordance with the decisions of this court. It is conceded that the description in the search warrants insofar as they are directed to the place of residence of the defendant, Alan Shaw, and residence of Robert Wood, who is charged in a separate information with the same offense for which the defendant is being prosecuted, is correct, but it is insisted that it is shown that other parties occupy the premises described as 129½ West Grand avenue besides the bookstore operated by defendant and

others, and for that reason the search warrant describes more than one place and is insufficient to justify the search and seizure of the books at the bookstore. There is some evidence on behalf of the defendant in his motion to suppress sustaining these facts, but the testimony of the officers and other evidence, including the address of the bookstore in the city directory and the address of defendant given in applying for his registration as a voter, are sufficient to sustain the finding of the trial court that the description set forth in the search warrant directed to the Progressive Book Store was sufficient to justify the search of said store. Such finding by the court on a motion to suppress evidence alleging an unlawful search will be sustained by this court where supported by competent evidence. Peterson v. State, 76 Okla. Cr. 46, 133 P. 2d 914.

In addition to the fact that the search warrants and affidavits upon which they were procured are sufficient under our law there is another reason why the motion to suppress was properly overruled. At the time of the search the defendant and the other parties charged in a separate information with this identical offense were under legal arrest for the alleged commission of a felony, to wit, the crime of criminal syndicalism. It is established law in this jurisdiction that where a party is legally arrested for a felony, such person and his premises may be searched in order to find and seize things connected with the crime as its fruits or as the means by which it was committed. Herren v. State, 74 Okla. Cr. 432, 127 P. 2d 384.

The defendant next contends that the evidence is insufficient to prove defendant's guilt beyond a reasonable doubt because there was no proof that defendant became or was a member of the Communist Party and no proof

of the principles and doctrines of the Communist Party, and in connection with this assignment of error further contends that the various exhibits of the state were improperly received in evidence as they were not connected to the defendant nor to the Communist Party and were probative of none of the issues.

On July 24, 1940, Wade Webb, a policeman of Oklahoma City, disguised as an oil field worker, went to the Progressive Book Store located at 129½ West Grand avenue in Oklahoma City. This bookstore occupied three rooms. A sign in the corridor at the entrance had painted thereon the words "Communist Party" and an arrow pointing into the bookstore. The place was open to all people and there were openly displayed many hundreds of volumes of books and pamphlets which were later seized by officers, many of which were introduced as exhibits in the prosecution of this case on the theory that they allegedly were writings which showed the principles of the Communist Party. Officer Webb purchased for the sum of 55 cents several pamphlets from Robert Wood. These pamphlets were admitted in evidence over the objection of the defendant, and their titles were as follows:

Save Your Union.
Jobs, Peace, Unity.
Must We Die?
The People's Road to Peace.
The War and the Working Class.
Ash-Can the M-Plan-The Yanks Are not Coming.
Roosevelt Heads for War.
War and the Workers.
State and Revolution.
Foundations of Leninism.
Sunday Worker, July 21, 1940.
Daily Worker, July 22, 1940.

The defendant Shaw was not present during any of this transaction.

Dan Hollingsworth testified that he was the head of the Intelligence Division of the Oklahoma City Police Department. That he had been making an investigation of alleged Communists for several months prior to August 17, 1940. That he swore to a criminal complaint charging the defendant and others with the crime of criminal syndicalism on August 17th and directed the arrest of the defendant. After the defendant was arrested he went to the bookstore at 129½ West Grand and with other officers seized a large number of books and pamphlets which were in the shelves of the bookstore. Part of the articles seized at that time were stamps of various denominations with the inscription "Dues, Communist Party, U.S.A.," with the value of the stamp placed thereon. Some of the stamps were marked "International Solidarity, 25¢" and some of the stamps inscribed "International Solidarity" were of different values according to the inscription thereon. Also seized at the book store were several letterheads inscribed:

"Communist Party, U. S. A.    State Headquarters:
                                       Room 212, 129½ West Grand Avenue,
  State of Oklahoma            Oklahoma City, Oklahoma

                               Mail Addresses:
  State Secretary:             P. O. Box No. 245, Oklahoma City, Okla.
    Robert Wood                P. O. Box No. 301, Tulsa
                                           Printing Donated."

Other letterheads seized at that time read:

"Progressive Bookshop

All Labor and Liberal Publications        Agents for the Midwest
                                                Daily Record

129½ West Grand Ave., Oklahoma City, Okla.

Printing Donated."

"P r e s s  R e l e a s e

Communist Party          (Emblem)          of Oklahoma

State Secretary:              Mail Addresses:
 ROBERT WOOD               P.O. Box No. 245. Oklahoma City, Okla.
State Headquarters:          P.O. Box No. 301, Tulsa
 Room 210, 129½ West         P.O. Box No. 735, Seminole
  Grand Ave.,                          Printing Donated."
 Oklahoma City, Oklahoma

On the same date a search was made of the home of
two other alleged Communists, Robert and Ina Wood,
and of the apartment house shared by Alan Shaw and
Eli Jaffe. All four of these parties were later charged
by informations identical with the one filed against the
defendant Shaw herein. At the home of the Woods and
also at the apartment house of Shaw and Jaffe a large
number of alleged Communistic books and pamphlets were
seized. At the Woods residence were found what pur-
ported to be a record of the membership of the Commu-
nist Party of Oklahoma listing the party members by
number instead of name and allegedly showing the pay-
ment by the respective members of monthly dues. The
defendant Shaw, Eli Jaffe and Wood were all at the
Wood residence at the time the search was made. In
the apartment house of Shaw was found a card claimed
by the prosecution to be the membership card of Alan
Shaw in the Communist Party. This card reads:

"Communist Party of the U.S.A.

1940
Membership
Book                                    No. 31923
Name          Alan Shaw
                   (Print)
State      Okla.          District          31

County      Okla.          City        Okla.

Section    (A.D. or Ward)      Branch          4

This book was issued on          12/3/39
                                 _____
Seal.                                    (Date)

                         Robert Wood (Signed)
                         _____
                         Signature of State or District Chairman
                              or Secretary, and Party Seal.
39
_____
No.

No Party Membership Book is valid unless it has the
Party Seal stamped thereon."

At the Progressive Book Store typewriters and mimeographs were found and on the walls were many pictures of alleged leaders of the Communist Party. In what purported to be the membership book of the Communist Party was found No. 31923, which corresponded to the number of the membership card alledgedly belonging to the defendant. This instrument purportedly showed the payment of monthly dues by the defendant up to and including the month of May, 1940. Also found at the Progressive Book Store, which the state contends was the headquarters of the Communist Party, were several sheets of paper on which was written in longhand by someone whose identity was never disclosed certain statements evidently purporting to be an account of the financial transactions of the Communist Party, one of which, in order to show the nature of said writing, is here reproduced:

|  | "In |  |  | Out |  |  |
|---|---|---|---|---|---|---|
| 7/17 | From Campgn |  | 7/15 | Gas | $ | .45 |
|  | Fund | $ 4.00 | 7/17 | Postage |  | .42 |
| 7/18 | M. Alexander |  | 7/17 | Gas |  | .70 |
|  | NY | 6.00 | 7/18 | Stamps |  | .32 |
| 7/20 | Huff | 100.00 | 7/19 | Gas & Oil |  | 1.67 |
|  |  |  | 7/19 | Phone |  | .20 |
|  |  |  | 7/19 | (not legible) |  | .35 |
|  |  |  | 7/19 | Postage |  | 1.00 |

7/19 (not legible)      .55
7/20 Alan               7.00
7/20 Bob               10.00
                    etc."

It was the contention of the state that the "Alan" appearing on said sheet referred to the defendant Alan Shaw and the "Bob" referred to his associate, Robert Wood, although no proof was offered to establish this fact. Among the other exhibits admitted in evidence was what the state contended was a work calendar which reads:

"Work Calendar.

8/12—9/14.

Mon. Aug. 12.

Get place for class #2
See people on class #2
Norman (7-3816)

- - -

Send cards for Thurs. nite meetings.
Check with Ina. an place, leaflet, etc.
See Lane re EPh
See Herb—re Wed. nite class & people
(nephew, Haley, hod-carriers)
            re speech
re peeve article

- - -

Call Valerie on Class #2
  "   Earl Ph. "    "    "
etc.

- - -

Tuesday—Aug. 13

People on class #2   (C Cat 9 a h
Prepare for teaching class #2

- - -

Check on Distribution of East Side leaflet.—

- - -

Articles for People's Voice

- - -

Letter to Forum

- - -

Pick up people for—
        (Class #2.)
etc."

Introduced as an exhibit seized at the book store was an instrument in writing labeled "Plans for Oklahoma City Anti-War Work" which reads:

"Resolutions in:

Hod Carriers — (Herb & Press) —
Postal Clerks — (Curtis) —
Postal Clerks Aux. — (lee) —
Stantionary Engineers — (Dewey) —
NAACP — (Ernest) —
Negro youth groups — (Eli) —
PWOC — (Sam & Herb) —
CIO CC — (Sam) —
SWOC — (Williams) —
Rebeccas — (Eastabrook) —
Cab Drivers — (Cox)?
Painters — (AK) —?
RR Brotherhood — (Rube) —
Oil Workers — (via Blakes) —
Teamsters — (on Anti-'trust' drive — via?) —
PTA in Pt — (Young)
L. Wo. Voters in Norman — (Mrs. F)
Ministerial Alliance (BOTH Negro and White (Revs.)
7th Day Advent.

                (2nd Sheet)

Plans for State Anti-War work (Alan, Andy, & Pat)

1.  Gathering material & preparing resolutions.
2.  Teamsters (in OC and Tulsa) & Anti-'Trust' prosecution
3.  Civil Liberties Campaign
4.  Negro Church Committee
5.  San Francisco AFL Resolution

6. Polls in OC, Tulsa, Creek, Okemah
7. Silver Star Mothers — OC, Tulsa, Creek
8. Spanish Vet's Statement
9. Letters to Congress
10. Edward's educational
11. Resolutions
12. Selling anti-war lit in unions (OC, Tulsa, Creek)
13.

(4th sheet)

Other Plans for Oc Anti-War work

Distribution of 4,000 Anti-War leaflets on East Side on "Negro & the War."
    & meetings

Special article in People's Voice on Mexico and the Oil Workers.
Poll
(Silver Star Mothers (in PT? first)
(Sale of Anti-war lit in unions.)"

All of the records, books, pamphlets and various exhibits seized at the bookstore and at the residence of Shaw were admitted in evidence over the objection of the defendant. When each of these exhibits was offered, counsel for defendant interposed objections. The objection interposed when each offer was made was substantially in the following language:

"The defendant objects to the introduction of this exhibit for the reason that it has not been properly identified or authenticated and for the further reason that no proper foundation was laid for its introduction, and there is no proof that said exhibit states the correct position of the Communist Party of the United States or the Communist Party of Oklahoma at the time of the arrest of the defendant or that this defendant has ever given his approval or sanction to said book, and it is incompetent, irrelevant and immaterial and does not tend to prove or disprove any of the issues in the case."

The assistant county attorney in charge of the prosecution, when these objections were interposed, would usually state: "They were in possession of defendant and are self-identifying."

Some of the titles of these books with their authors listed and which were admitted in evidence over the objection and exception of the defendant are:

"The United Front—Georgi Dimitroff

The Revolutionary Movement in the Colonial Countries—Wang Ming

The Work of the Seventh Congress—D. Z. Manuilsky

The Communist Party—International Publishers, Inc.

The Constitution of the Young Communist League—New Age Publishers

The Truth About Finland—Israel Amter

The Reds in Dixie—Tom Johnson

Imperialism and Imperialist War—Lenin

Toward the Seizure of Power—Lenin

A B C Of Communism—N. Bucharin, E. Preobraschensky

Social and National Security—Earl Browder

Songs for America—Workers Bookshop

Communism in the United States—Earl Browder

The Teachings of Karl Marx—Lenin

Your Questions Answered—Wm. Z. Foster

What is Communism?—Earl Browder

The History of the Russian Revolution—Gorky Molotov, Stalin

Karl Marx—Perchik

Socialism and War—Lenin

The Foundation of the Communist International—Lenin

Earl Browder Takes His Case to the People—Browder

The World Communist Movement—D. Manuilsky

The People Against the War Makers—Browder

15 Years of the Communist Party—Bittelman

Program of the Communist International—Workers Library

The Communist Position on the Farmers Movement — Workers Library

Negro Liberation—James S. Allen
Problems of Leninism—Stalin
Mastering Bolshevism—Stalin
From Socialism to Communism in the Soviet Union —
    Stalin
What is to be Done?—Lenin
Our Country—Stetsky, Ingulov, Baransky
The Communist Position on the Negro Question—Brow-
    der, Hathaway, Haywood
Ten Days that Shook the World—John Reed
Dictatorship and Democracy in the Soviet Union—Anna
    Louise Strong."

This court has read most of the books above named
and others which were incorporated as a part of this
record and those which have not been carefully read have
been checked so that we might learn the substance of the
matters therein stated.

As to the contention of defendant that there is no
competent proof to show that he became or was a mem-
ber of the Communist Party in Oklahoma, we cannot
agree. While there is no positive identification of the
person Alan Shaw whose name appears upon the exhibit
styled "membership card" in the Communist Party, this
card was a strong circumstance to prove that defendant
was a member. It was taken from the possession of de-
fendant. While nobody testified that the signature "Robert
Wood, State Secretary, Communist Party," which ap-
pears thereon, was the signature of Robert Wood, the
card does bear a seal allegedly of the Communist Party.
In addition to that the registration certificate wherein
the defendant registered as a voter for the 1940 election
shows that Alan Shaw, whose residence was at 2320 S.W.
19th street in Oklahoma City, was registered on June
19, 1940, by Buelah Screeton. In this registration cer-
tificate Shaw gave his occupation as Secretary of Com-

munists and politics as Communist. A copy of a letter was introduced in evidence found in the files of the defendant at his residence addressed to the city manager of Oklahoma City seeking to secure the use of the Municipal Building for a meeting of the Communist Party and signed "Alan Shaw," city secretary of the Communist Party. The date of the membership card is December 3, 1939, and this instrument was sufficient evidence in the absence of any contradiction to show that the defendant became a member of the Communist Party of the United States of America in Oklahoma county, Okla., within three years prior to the filing of the information. In addition, the defendant filed a motion for a continuance in the trial court in which motion he recited the arrest of defendant and several other persons and stated that they were all members of the Communist Party. Said motion further recites that a prejudice existed in Oklahoma county toward defendant and all other members of the Communist Party in Oklahoma county. This motion was sworn to by the defendant, Alan Shaw, and was an admission that he was a member of the Communist Party. These exhibits, together with other circumstantial evidence introduced by the state, were sufficient in the absence of any proof to the contrary to sustain that part of the information which alleges that defendant became a member of the Communist Party in Oklahoma county.

The contention of the defendant that the books, pamphlets and other written material admitted in evidence over objection of defendant and purportedly showing the doctrines advocated by the Communist Party, without some evidence to authenticate these various exhibits and to show that the statements therein made were in truth and fact statements representing the true position of the Communist Party, is so fundamentally sound that this

court has been unable to find any legal authority to sustain the admission of this evidence. Counsel for the state in their brief cited a few cases in which the trial courts in criminal syndicalism cases had admitted in evidence certain literature purportedly stating the principles advocated by the organization involved in the trial. We have examined each of these cases and in all of them some witness who was a member of the organization in question and familiar with the activities of the accused testified that the literature admitted in evidence clearly stated the principles advocated by such organization and that the accused as a member of that organization sanctioned the principles set forth in the literature which was admitted.

The California cases relied upon by the prosecution arose shortly after the close of the first World War and involved alleged members of the Industrial Workers of the World. The state procured the help of the witnesses Townsend and Coutts, who belonged to the I.W.W., and they told in detail the operation of the organization and explained at length the alleged acts of violence advocated by the organization together with the meaning of certain words or phrases employed by the members of said organization in expressing the various criminal acts which they proposed to perpetrate to create a general state of terrorism among the people. They disclosed the activities of the accused and identified the literature as being literature which had been furnished to them as members of the I.W.W., and the evidence being thus properly authenticated was admissible. There is no analogy, however, between the facts in those cases and the facts herein. Not a witness testified for the state in the instant case that they ever heard the defendant or any of those charged in similar informations with this identical crime state one

word showing their connection with the Communist Party, or state one word showing that the Communist Party advocated the particular acts of violence which the state maintains they do advocate. Not one witness for the state attempted to identify the exhibits as correctly reporting the principles advocated by the Communist Party. The book "The Reds in Dixie," purportedly written by one Tom Johnson, was quoted at length in the argument of the assistant county attorney to the jury and is quoted in the brief on behalf of the state filed herein. This is one of the exhibits to which complaint is made by defendant. When this exhibit was offered in evidence the policeman who had kept it in his possession from the time of the raid testified that it had been seized at the bookstore. He had not heard the defendant make any statement concerning the book and he had no personal knowledge that the statements contained in this book correctly showed principles advocated by the Communist Party. The statements appearing in this book are very objectionable and such as would not be approved by a good citizen with sane thoughts. It purports to tell the negro race how they should proceed to create a state within the boundaries of the southern states of the United States by overthrowing the present ruling classes and setting up a black belt to be governed solely by negroes. Many of the books admitted in evidence teach substantially similar doctrines and make repetitious statements. They recite that there is a natural and irreconcilable antagonism between the upper and lower classes of society; between the rich and poor; between the proletariat and the bourgeoise; that democracy is an instrument of oppression used by the bourgeoise against the proletariat and that this democracy must be overthrown. Their activities are governed by direct orders from Moscow. The objectives stated in

some of these books could be obtained only by violent revolution.

The pamphlet styled "The Constitution and By-Laws of the Communist Party of the United States of America" was admitted in evidence over the objection of defendant that it was not properly authenticated and no evidence to show that it correctly stated the constitution and by-laws of the Communist Party. The prosecutor stated that it was self-identifying and the instrument was admitted in evidence. Notwithstanding the fact that we think no sufficient predicate was laid for its admission, we have examined this instrument and find nothing in it which is at all improper. The preamble set forth at the beginning provides:

"The Communist Party of the United States of America is a working class political party carrying forward today the traditions of Jefferson, Paine, Jackson, and Lincoln, and of the Declaration of Independence; it upholds the achievements of democracy, the right of 'life, liberty, and the pursuit of happiness,' and defends the United States Constitution against its reactionary enemies who would destroy democracy and all popular liberties; it is devoted to defense of the immediate interests of workers, farmers, and all toilers against capitalist exploitation, and to preparation of the working class for its historic mission to unite and lead the American people to extend these democratic principles to their necessary and logical conclusions:

"By establishing common ownership of the national economy, through a government of the people, by the people, and for the people; the abolition of all exploitation of man by man, nation by nation, and race by race, and thereby the abolition of class divisions in society; that is, by the establishment of socialism, according to the scientific principles enunciated by the greatest teachers of mankind, Marx, Engels, Lenin, and Stalin, embodied

in the Communist International; and the free cooperation of the American people with those of other lands, striving toward a world without oppression and war, a world brotherhood of man.

"To this end, the Communist Party of the United States of America establishes the basic laws of its organization in the following Constitution."

The rest of the exhibit is devoted to the method of organization of the party with rules determining the eligibility for membership in the organization, the initiation fees and dues for members, and the rules with reference to the conduct of their meetings, together with special rules concerning the formation of an executive committee of the party. Article 8 provides that supreme authority in the Communist Party is the National Convention which shall be held every two years and this article further provides for the manner of the selection of delegates to this convention. Article 11 provides:

"The Communist Party of the U.S.A. is affiliated with its fraternal Communist Parties of other lands through the Communist International and participates in International Congresses, through its National Committee. Resolutions and decisions of International Congresses shall be considered and acted upon by the supreme authority of the Communist Party of the U.S.A., the National Convention, or between Conventions, by the National Committee."

If this instrument had been properly authenticated so as to be legally admissible in evidence, it would have been proper to have shown the resolutions and decisions of the Communist International as tending to prove the purposes of the Communist Party of the United States, but the resolutions and decisions of the Communist International would likewise have to be properly authenticated before they in turn would be admissible in evidence.

We know of no rule which authorizes the admission of such evidence as self-identifying. By statute, 12 O. S. 1941 § 484, it has been provided in Oklahoma that printed copies in volumes of statutes, codes or other written law enacted by any other state or territory shall be admitted as presumptive evidence of such laws. We do not know of any instruments in writing which may be admitted in evidence for the reason that they are "self-identifying" except those named in Title 12, chapter 10, O. S. 1941, none of which would include the writings here in dispute.

In the case of Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 735, 81 L. Ed. 1066, a case involving a conviction in Georgia wherein the defendant was charged by indictment with attempting to induce others to join in combined resistance to the lawful authority of the state and to overthrow such authority by open force and unlawful acts, the conviction of defendant rested upon certain statements he had made in speeches and upon certain booklets and documents found in his possession at the time he was arrested. Many of these periodicals and pamphlets were identical with the ones admitted in evidence in the instant case. In discussing this question the Supreme Court of the United States stated:

"No inference can be drawn from the possession of the books mentioned, either that they embodied the doctrines of the Communist Party or that they represented views advocated by the appellant."

In the case of People v. Manganaro, 218 N. Y. 9, 112 N. E. 436, 438, the court, in discussing a confession apparently written and signed by defendant and found in his room when he was arrested, stated:

"Neither the fact that the name of the defendant was written at its end, nor the fact that it was found in the room which the defendant had occupied, granted the as-

sumption that he was its author. The proof did not authenticate it, and its admission in evidence was error."

In the case of People v. Bailey et al., 66 Cal. App. 1, 225 P. 752, 755, a criminal syndicalism case from California, objection was made to the admission of certain literature purportedly showing the political doctrines of the I.W.W. Those exhibits were held admissible because the testimony of the witness Townsend had properly connected them with the organization and with the defendant. However, in discussing the question of the admissibility of this literature the court stated:

"Of course, a general commentary or dissertation upon the principles or doctrines, unless a defendant on trial was himself the author thereof, or unless shown to have been published or adopted by the organization itself, would not be admissible."

In People v. Cox, 66 Cal. App. 287, 226 P. 14, 18, in discussing the admissibility of this character of evidence, the court states:

"To constitute proof by way of an admission of the recitals contained in the exhibits the signatures thereto should have been authenticated in the manner provided by section 1940, Code of Civil Procedure."

Further in the opinion, in discussing the complaint of the defendant concerning the exclusion of certain pamphlets written by persons stating the aims, purposes, motives and patriotism of defendant's organization, the court stated:

"The inadmissibility of such testimony is so clearly apparent that we do not need to give the ruling of the court thereon any extended consideration. It is what the organization does as an organization that stamps its character, and not what others may think about it."

If we would apply this same reasoning to the books written by various authors purportedly stating the aims

of the Communist Party, such as "The Reds in Dixie," hereinabove discussed, we should have to hold that said book was inadmissible as evidence as the hearsay statement of a person not shown to be a member of the Communist Party.

In Hartzell v. United States, 8 Cir., 72 F. 2d 569, 578, it is stated:

"Ordinarily, where a writing is not shown to have been executed by the defendant, it cannot be offered in evidence against him. To be admissible in a criminal case, either to connect the defendant with the commission of the crime, or to procure a verdict against him, a writing must be established with that degree of certainty recognized as necessary to a conviction. Sprinkle v. United States [4 Cir.], 150 F. 56. A writing, of course, does not prove itself, and there is no presumption that a telegram is sent by the party who purports to send it. McGowan v. Armour [8 Cir.], 248 F. 676; Drexel v. True [8 Cir.], 74 F. 12; Ford v. United States [9 Cir.], 10 F. 2d 339. The government was therefore bound under the established rules of evidence to prove that Hartzell was the person who sent these messages."

In the case of McGowan v. Armour, 8 Cir., 248 F. 676, the second syllabus provides:

"A letter purporting to have been written by defendant to plaintiff's husband, whose affections it was charged defendant had alienated, is inadmissible, where neither the handwriting nor the signature was identified as that of defendant, for a letter does not prove itself, and must be shown to have been written by the person against whom it is produced, or by some one authorized to act in his behalf."

If Tom Johnson, the purported author of "The Reds in Dixie," had made a statement in a speech in New York City that the Communist Party believed in establishing a negro state in Dixie, no one would have questioned that

such statement would have been inadmissible against the defendant because it was hearsay. The fact that a book is found purportedly written by one Tom Johnson and published in New York does not entitle it to admission as evidence any more than oral statements made by the same individual, unless there is some connection shown to the defendant or that he sanctioned the writing.

"The hearsay rule applies as forcibly to statements in writing as it does to those verbally made." Ferriman v. Turner, 99 Okla. 277, 227 P. 443, 446.

In considering the statement of the prosecutor that the articles were self-identifying, we quote from Professor Wigmore in his article on Evidence (3rd Ed.) § 2150:

"Printed matter in general bears upon itself no marks of authorship other than contents. But there is ordinarily no necessity for resting upon such evidence, since the responsibility for printed matter, under the substantive law, usually arises from the act of causing publication, not merely writing, and hence there is usually available as much evidence of the act of printing or of handing to a printer as there would be of any other act, such as chopping a tree or building a fence. There is therefore no judicial sanction for considering the contents alone as sufficient evidence."

See, also, Richardson et al. v. Evans, 5 Okla. 803, 50 P. 85; Wharton, Criminal Evidence (9th Ed.) § 682.

It should be borne in mind that the prosecution herein is for being a member of a certain party which advocates the overthrow of the government by force and violence. This prosecution differs from another prosecution against the same defendant, called to our attention by counsel for both the state and defendant, wherein defendant is charged jointly with Robert Wood and others with printing, publishing, editing and knowingly circulating and distributing certain books, pamphlets, papers, etc., advo-

cating and affirmatively suggesting criminal syndicalism. In the last case the possession of a large number of identical books which teach the doctrine of criminal syndicalism might be admissible where found in the possession of defendant as a circumstance tending to show an intent to distribute, but where it is alleged that the defendant is a member of a political organization which advocates certain principles, then, in order for books in his possession to be admissible as evidence to show the teachings of the political organization to which it is alleged the defendant belonged, the books must be properly authenticated, or proof either direct or circumstantial that defendant approved of the writings as representing the views of his organization.

The forcefulness of this rule cannot be better illustrated than to call attention to the social upheaval which has gradually taken place in recent years. The books in general relied upon by the prosecution were written many years ago, some of them even dating back as far as 1848. Probably the social revolution which has occurred during the last ten years in this Nation, in some particulars, has exceeded even the fondest hopes of most of these self-named reformers. After reviewing the social reforms of the past decade, which were inaugurated without bloodshed and which in some instances are similar to certain principles advocated in the purported Communist platform, these people might have altered their views that the only way their aims could be realized was by a violent revolution and a forcible overthrowing of the existing government. It is perfectly permissible to make any changes in our government that are desired by the majority of our citizens where the same is done in a peaceable manner and at the ballot box.

Thomas Jefferson, our beloved third president, stated in his first inaugural address:

"If there be any among us who wish to dissolve this Union, or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." Life and Writings of Thomas Jefferson (Foreman) p. 247.

He also stated:

"I hold a little rebellion now and then is a good thing and as necessary in the political world as storms in the physical." Life and Writings of Thomas Jefferson (Foreman) pp. 296, 297.

In view of the fact that there are other cases filed against various persons identical with the charge herein, which cases were by agreement allowed to remain untried pending the disposition of this appeal, it is necessary that we discuss one other proposition presented by the defendant in order that the trial court may have the benefit of our views in the future trial of these parties.

It is the contention of the defendants that before the defendant could be found guilty, the state must prove overt acts committed either by the defendant or by the Communist Party, which unlawful acts had been committed to accomplish the aims against which the statute guards. The position of the defendant is best stated in one of the requested instructions which was refused by the court. This request reads:

"You are further instructed that you must find the defendant not guilty unless you find beyond a reasonable doubt that the Communist Party advocates, teaches or affirmatively suggests the expediency and advisability of the commission of crimes, the destruction of property, the doing of acts of violence as a means of bringing about industrial and political change or revolution and unless

you further find that such teaching and advocacy created a clear and imminent danger of bringing about industrial and political change or revolution in the State of Oklahoma."

The doctrine of clear and present danger was first enunciated by that militant minority, Justices Brandeis and Holmes. Justice Holmes, in the early case of Schenck v. United States, 249 U. S. 47, 39 S. Ct. 247, 249, 63 L. Ed. 470, in discussing the prohibition of laws abridging freedom of speech, stated:

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no court could regard them as protected by any constitutional right."

Following Schenck v. United States, supra, Justice Brandeis, in a special concurring opinion in Whitney v. California, supra, elaborated on this doctrine as follows:

"Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. Propagation of the criminal state of mind by

teaching syndicalism increases it. Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated.

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution. It is therefore always open to Americans to challenge a law abridging free speech and assembly by showing that there was no emergency justifying it.

"Moreover, even imminent danger cannot justify resort to prohibition of these functions essential to effective democracy, unless the evil apprehended is relatively serious. Prohibition of free speech and assembly is a measure so stringent that it would be inappropriate as the means for averting a relatively trivial harm to society. * * * The fact that speech is likely to result in some violence or in destruction of property is not enough to jus-

tify its suppression. There must be the probability of serious injury to the state. Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly.

"* * * Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger, whether the danger, if any, was imminent, and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the Legislature. The legislative declaration, like the fact that the statute was passed and was sustained by the highest court of the state, creates merely a rebuttable presumption that these conditions have been satisfied."

This doctrine of clear and present danger has guided the Supreme Court of the United States in its recent disposition of a great number of cases in passing upon the constitutionality of convictions for various crimes where it is claimed by the defendant that the conviction unwarrantedly was a restriction upon one of the freedoms guaranteed by our Bill of Rights. Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066; De Jonge v. State of Oregon, 299 U. S. 353, 365, 57 S. Ct. 255, 81 L. Ed. 278; Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; Stromberg v. People of State of California, 283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117, 73 A.L.R. 1484; Bridges v. State of California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192; Cantwell v. State of Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352.

In their latest expression on this subject in Bridges v. California, supra [314 U. S. 252, 62 S. Ct. 194, 86 L. Ed. 192], we find it stated:

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

The law of that case can best be summarized by reference to the various syllabi reported as a preface to the above decision, as follows:

"To justify suppression of free speech, there must be reasonable ground to fear that serious evil will result if free speech is practiced, and there must be reasonable ground to believe that the danger apprehended is imminent.

"The likelihood, however great, that a substantive evil will result cannot alone justify a restriction on freedom of speech or the press, but the evil itself must be substantial and must be serious, and even the expression of legislative preferences or beliefs cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression.

"The First Amendment which prohibits any law abridging the freedom of speech or of press must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow, and before utterances can be punished the substantive evil that will likely result must be extremely serious and the degree of imminence must be extremely high.

"The freedom of speech and of the press secured by the First Amendment against abridgement by the United

States is similarly secured to all persons by the 14th Amendment against abridgement by a state.

"Neither 'inherent tendency' nor 'reasonable tendency' to cause a substantive evil is enough to justify a restriction of free expression."

One of the criticisms of the clear and present danger theory is contained in the case of People v. Lloyd, supra, cited with approval in Gitlow v. People of State of New York, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138. The Supreme Court of Illinois (136 N.E. at page 512) stated:

"Plaintiffs in error seem to argue that the language of the act must be such that the term 'violence and other unlawful means' is limited to such unlawful acts as create a clear, real, and imminent danger to the form of government now secured to this state; but this is not the true law. Of course, if the acts are too trivial for the law's notice, and create no apparent danger and no perturbation in the peaceful order of things, then no crime is committed: but if the means advocated are apparently adapted to the end, then the public peace, so far as advocacy is concerned, is as much disturbed as if they should be so actually. 1 Wharton on Crim. Law (11th Ed.) §§ 221-225; 1 Bishop's New Crim. Law, §§ 737-740. Manifestly the Legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government, without waiting until there is a present and imminent danger of the success of the plan advocated. If the state were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law. The act under consideration makes the advocacy of the overthrow of the government a felony, and provides for the punishment of the advocate, and so it is not necessary that there be a real or actual effort to carry out the program that he advocates."

There can be no question but what the State of Oklahoma has power and authority to provide by legislation, not only for the protection of the health, morals and safety of the people, but for the common good, as involved in the well-being, peace and prosperity of its people.

The legislative body of Oklahoma in the constitutional exercise of its discretion has stated that utterances of a certain kind involve such danger of substantive evil to our government that they may be punished. They have decreed that such utterances by their very nature involve danger to the public peace and security of the state. They threaten breaches of the peace and eventual overthrow of the existing government. It is difficult to determine, and the state should not be required to accurately measure, the danger from every utterance that is made. It was the desire of the Legislature to extinguish the spark of revolution without waiting until it enkindled the flame or blazed into a conflagration.

Since we have stated at the beginning of this opinion that the statute herein involved does not trespass any of the constitutional guaranties, there remains only the question as to whether this constitutional statute is correctly construed and applied in the instant case.

Membership in any party cannot be prohibited merely because of the name of the party. If a party advocates the violent overthrow of existing government, it would be criminal even though it may be called the Democrat or Republican Party. Likewise, the fact that a party may be called Communist Party may not be condemned because of its name, but whether it is criminal is dependent solely upon the fundamental character of the organization. The word "Communist," because of the widespread unfavorable publicity given to its organ-

ization, engenders in the public mind immediately the picture of a revolutionist, one who is against the existing form of our government, one who has such a strong disregard for the existing laws that they would forcibly overthrow them, divide the citizens into warring classes and bring about riots and disorder.

It is fundamental that the question of the guilt of any individual is personal and must be determined by the activities of that individual. An individual ought not to be condemned for mere membership in an organization nor held to believe in, advocate and work to accomplish every word, sentence, or plank in a party platform, because it is common knowledge that practically all of us belonging to the Democrat or Republican Parties do not read carefully all of the party platform, and that many of those who do read them do not agree with each and every party pronouncement. There must be proof of a conscious guilt by individual action before it can be said that the individual adopts and approves the language of the party platform. People v. Lloyd, supra. This proof may be established by showing that the accused took an active part in the organization and advancement of his party and had enlarged and explained the meaning of the party platform and program by speech, writings, or other activities. When such activities of an accused are shown in this manner and that his organization believes in the overthrow of our government by the bullet instead of the ballot, he then is brought within the prohibition of the criminal syndicalism statute.

It should not be assumed, in view of all that has been said, that freedom of speech and of the press secured by the Constitution confers an absolute right to speak or publish without responsibility whatever one may choose. It is strange indeed that there might be those who seek

to overthrow our existing government which guarantees these freedoms and attempt to transform this republic into one where the word of the dictator becomes the law of the land, and then when he is caught practicing these subversive doctrines presents as his defense the very liberties which he would destroy. But if we were to deny to one of these any one of the guaranties provided by our Constitution, it would establish a precedent that might in the future cause the arrest and confinement of thousands of our citizens and would more surely result in a violent revolution and overthrowing of our government than these alleged statements of a puny few.

It has always been a difficult problem to determine whether loose utterances directed at our government, when spoken, might better be left unpunished by the criminal laws of the land with the belief that the good judgment of the overwhelming majority of the citizens would control the evil that might result from any errors of statement made in such utterances so far as the public welfare might be endangered thereby. When people get in a certain frame of mind they should be left at liberty to speak with that freedom with which the magnitude of the supposed wrongs appear in their minds to demand. The question, however, is whether the utterances of criticism of the government are made in a peaceable manner or at such a time and place as might be immediately dangerous to public peace. It is a legislative question, but a serious one, as to what is the best and wisest way to deal with the thoughts, feelings and existing prejudices of the human mind and whether anything can take the place of free public discussion. Oftentimes we have seen illustrations where the average person, when given an opportunity to let off a little steam and publicly express himself against the possible wrongdoings of the govern-

ment, is fully satisfied. It would seem that we should take all steps to adequately protect our existing institutions, but at the same time so preserve them that the wording of the law may not be construed to make trouble for many patriotic citizens who may disagree with existing conditions in the affairs of our government.

It is our conclusion that the Legislature in the first instance has found that certain utterances by their very nature threaten the existing government. That notwithstanding this legislative declaration, especially in view of decisions of the Supreme Court of the United States, hereinabove cited, that a defendant being tried on a charge of being a member of an organization advocating criminal syndicalism has a right to have submitted to the jury as a question for their determination whether the principles alleged to have been advocated by the organization are such as to present a real and imminent danger of violence, sabotage or unlawful acts against our government. The defendant presented several requested instructions which were similarly worded and all directed to this single proposition. The instruction hereinabove quoted is typical. The jury should have been instructed in substance that they must find beyond a reasonable doubt not only that defendant had become a member of an organization which advocated crime, physical violence, sabotage or other unlawful acts or methods as a means of accomplishing or effecting industrial or political ends, but that such advocacy was reasonably likely to result within the immediate future in the commission of serious violence or other unlawful acts for the purpose of bringing about political or industrial change or revolution by such means.

This court appreciates the fact that the statute under which these prosecutions have been instituted is general

in its nature and there has been no clear pattern fixed in this state which might be followed in the prosecution of these cases. No person more bitterly condemns those who would overthrow our government or seek to sabotage our war effort than members of this court. Only a short year ago a young lad of the author's family was killed in the crash of his basic training plane. Many times the thought has occurred that some saboteur may have tampered with his machine causing it to flounder in midair and crash. But even with this confessed bitterness toward those who are not one hundred per cent behind this country as it is now established and functioning, the author is convinced that under our Constitution and the established law of the land as reflected by the decisions above quoted this conviction must be reversed. If this court were to sustain the conviction, it could only be because there is a popular demand for it and this in effect would mean a substitution of mob rule for that of courts of law.

If the defendant and his associates who were charged in companion cases do believe in the doctrines as stated in some of the books which we have read, they should not advocate the same in Oklahoma. They should realize that the 48 men composing the four juries who unanimously and speedily gave them the maximum sentence under the law were speaking the sentiments of the community in general, and that the public is practically unanimously against such doctrines and will not condone such advocation.

There are many other assignments of error presented in either the argument or by brief. With the exceptions herein noted, the ruling of the trial court in all other instances appears to have been proper.

The judgment of the district court of Oklahoma county is reversed and remanded for further proceedings consistent with this opinion.

BAREFOOT, J., concurs. DOYLE, J., absent and not participating.

On Petition for Rehearing. Petition denied.

Stanley Belden, of Cushing, for plaintiff.

Mac Q. Williamson, Atty. Gen., for defendant.

JONES, P. J. Petition for rehearing with brief attached has been filed. In view of the extraordinary length of the brief and of some of the extravagant statements used by counsel in challenging the conclusions reached by a majority of this court in our opinion, we feel a further statement of the issues should be made.

Although counsel devotes several pages in his brief to what he terms the Communist menace and the obligation which he alleges this court owes to see that this menace to our government is checked, we again emphasize that we intend to dispose of the issues herein solely upon what we determine to be the applicable law and without any consideration of extrajudicial matter.

House Bill No. 17, passed by the 1941 Oklahoma Legislature, 51 O. S. 1941 §§ 31-35, is cited and stressed as emphasizing the inherent danger of the Communist Party. This act disqualifies members of the Communist Party from being elected or appointed to public office in Oklahoma. It was passed subsequent to the institution of the prosecution herein and probably as an outgrowth thereof. If there should have been anything in said act which would have affected the guilt or innocence of defendant, the same would not be considered by this court because of the constitutional provision placing a

ban on passage of ex post facto laws. Constitution, article 2, sec. 15.

Counsel state that our opinion completely nullifies the criminal syndicalism statute. This is not true. It was our purpose to sustain the statute, but at the same time establish certain legal principles in accordance with the Constitution which would govern in its future application. There can be no question but that the Supreme Court of the United States has applied the clear and present danger test in all of their recent expressions where the scope of constitutional protections of freedom of speech, of the press, or of religious worship, were in issue. In reference to this test, the United States Supreme Court recently stated in Bridges v. State of California, 314 U. S. 252, 62 S. Ct. 190, 193, 86 L. Ed. 192:

"It has been utilized by either a majority or minority of this court in passing upon the constitutionality of convictions under espionage acts, Schenck v. United States, supra [249 U. S. 47, 39 S. Ct. 247, 63 L. Ed. 470]; Abrams v. United States, 250 U. S. 616, 40 S. Ct. 17, 63 L. Ed. 1173; under a criminal syndicalism act, Whitney v. [State of] California, supra [274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095]; under an 'anti-insurrection' act, Herndon v. Lowry, supra [301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066]; and for breach of the peace at common law, Cantwell v. [State of] Connecticut, supra [310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352]. And very recently we have also suggested that 'clear and present danger' is an appropriate guide in determining the constitutionality of restrictions upon expression where the substantive evil sought to be prevented by the restriction is 'destruction of life or property, or invasion of the right of privacy.' Thornhill v. [State of] Alabama, 310 U. S. 88, 105, 60 S. Ct. 736, 745, 84 L. Ed. 1093."

Counsel contend that this test should not be applied to a prosecution under a criminal syndicalism statute.

However, the above language of the United States Supreme Court shows that this principle is used as a guide whenever any of the personal rights safeguarded by the Constitution are put in issue.

The Bill of Rights belongs to all of the people and not merely to Communists or other unpopular minorities. It may be invoked by them at the moment, but its protecting arm is thrown about every citizen. If we let down the bars to make it easier to convict Communists, then the bars will be down as to all other citizens. All people benefit when courts insist on the maintenance of free speech and other constitutional liberties for men we dislike.

It should be borne in mind that the constitutional principles in question are relative and not absolute. By that we mean that in the realm of constitutional guarantees of personal liberties the guarantees remain, but their application must often be temporarily modified lest the security or very existence of the state be endangered. It is mere common sense to recognize that certain acts and utterances which it is unnecessary and unjustifiable to restrict or punish in times of peace must, in the plain interest of the nation's safety, be controlled in time of war or quasi-war. Thus when no threat of war impends much leeway can be given to statements opposing recruiting for the armed forces and opposition to war. But with an enemy at the gate and when every nerve is strained to recruit a maximum number of men to fight for our very existence, no reasonable man could contend that a like easygoingness would be possible, although the actions and words are precisely the same. The written terms of the constitutional guarantee of free speech and press would not have altered; but the changed conditions would make its application, for the time being, very different.

Once the courts let suppression get under way it spreads very fast and any group or organization is likely to fall a victim.

Our attention is directed to the ban placed by the Communists in Russia at the beginning of their rule upon all forms of religious worship. If present historical and political writers can be believed, these restrictions on religious worship have been greatly relaxed in the last five years. But irrespective of that, if we should adopt a construction of the statute in question which is insisted upon by counsel for the state, it is conceivable that this rule might at some time be invoked by a majority to persecute members of any of several religious organizations here in our own state, merely because they are composed of an unpopular minority. It is easy to recall that the wealthy men of Germany were delighted when Hitler began rounding up Jews and Communists and seizing their properties, and one of the wealthiest, Mr. Thyssen, the steel magnate, contributed large sums of money to help Hitler carry on this work. It was not long, however, until Thyssen had all of his property seized and he departed for Switzerland in a hurry, where he now spends his time writing articles telling how badly Hitler treated him.

It is always open to Americans to challenge in the courts a law which in its application to them abridges freedom of speech or assembly, by showing that there was no emergency justifying the application of the statute.

Vigorous language was used by counsel in objecting to that part of our opinion ruling that the books and papers introduced against defendant were improperly received in evidence. They again assert that these articles are self-identifying, referring to the same cases

set forth in their original brief. We did not discuss each of these cases separately because it was apparent that they were not in point and we did not wish to add to an already lengthy opinion. At counsel's insistence we have again read these cases. In some of them the evidence was admitted without any objection on the part of defendants so that no question as to the admissibility of such evidence was before the appellate court. Albizu v. United States, 1 Cir., 88 F. 2d 138; People v. McClennegen, 195 Cal. 445, 234 P. 91; People v. Ruthenberg, 229 Mich. 315, 201 N. W. 358; People v. Chambers, 22 Cal. App. 2d 687, 72 P. 2d 746. In other cases cited, the objections were not properly made, so that the question of the admissibility of the evidence was not saved. People v. Johansen, 66 Cal. App. 343, 226 P. 634; People v. Cox, 66 Cal. App. 287, 226 P. 14; People v. Lloyd, 304 Ill. 23, 136 N. E. 505. In still other cases, the defendants conceded, either at the trial or on the appeal, that the literature offered had been adopted by the organization involved, ratified by the defendants, and was thus binding upon them. Dunlop v. United States, 165 U. S. 486, 17 S. Ct. 375, 41 L. Ed. 799; State v. Tonn, 195 Iowa 94, 191 N. W. 530; People v. Powell, 71 Cal. App. 500, 236 P. 311; State v. Dingman, 37 Idaho 253, 219 P. 760; State v. Hemhelter, 115 Wash. 208, 196 P. 581; State v. Payne, 116 Wash. 640, 200 P. 314. These admissions were direct statements accepting full responsibility for everything contained in the literature. In the remaining cases cited in the state's brief, proof, entirely lacking here, was received which established that the literature had been issued under the authority of the organizations with which the defendants were associated. State v. Laundy, 103 Or. 443, 204 P. 958, 206 P. 290; State v. Lowery, 104 Wash. 520, 177 P. 355. In some of these cases the judgments of conviction were reversed.

All of our discussion in the opinion concerning the books and pamphlets seized at the bookstore was directed solely to the question as to whether they might legally be used to show the principles of the Communist Party simply because they were found in a bookstore being operated by an alleged Communist and because some of the books themselves purportedly related some of the activities of the party.

The evidence showed by inference from written statements in the handwriting of one of the accused that meetings had been held with various organizations. What was said or done at any of these meetings was never sought to be shown. If the accused had asked anyone to purchase the books and explained that by reading them they would learn of the activities of the Communist Party, or if he had taken the books to one of the meetings and there sold or distributed them stating that they represented the views of his party, or if he had committed any act which, by reasonable inference, could be said to have shown that defendant had approved of the books as representing the views of his organization, then a sufficient predicate would have been laid to have authorized the admission of the books in evidence for the purpose of showing the work and political aims of the Communist Party. As the record stands, the books might be admissible for some limited purposes but not admissible under a charge of belonging to a party that allegedly advocates criminal syndicalism for the purpose of showing that the views therein expressed were the views of such party.

The defendant's connection with one Robert Wood has been shown and it may be that there was sufficient conversation between Wood and Officer Webb at the time of Webb's purchase of the books to have shown a connec-

tion between the Communist Party and the literature in question. But if there were such conversation it was not developed in the evidence. All the record discloses is that Webb had been instructed to go to the bookstore and purchase certain books. He went to the store, called for the books, paid the purchase price and left. Webb was not asked in his examination by either the state or counsel for defendant if Wood had made any statement concerning the books which were purchased or any other books. It should be borne in mind that there were many other books in the store besides those allegedly pertaining to the activities of the Communist Party. Among other books were a large number of copies of the United States Constitution and autobiographies of many of the famous men in American history. Many of the books admitted in evidence did not mention the Communist movement by name. In fact, the books which are the most subject to criticism do not mention the Communist Party or Russian revolution, but are books relating the personal views of the author concerning historical events or the proper solution to certain social problems of the times mentioned in the book. Although the state contends that many of the authors of these publications were Communists, there is nothing in the record to so show.

After a thorough consideration of all of the matters, we are firmly convinced that the conclusions we reached in our opinion are correct and that the petition for rehearing should be denied and the mandate forthwith issued.

It is so ordered. BAREFOOT, J., concurs. DOYLE, J., dissents.