# ROBERT WOOD v. STATE.

No. A-10046.   Sept. 15, 1943.

(141 P. 2d 309.)

306

See, also, Ex parte Wood, 71 Okla. Cr. 200, 110 P. 2d 304.

George E. Croom, of Tulsa, and Stanley D. Belden, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis R. Morris, Co. Atty., and John F. Eberle, Asst. Co. Atty., both of Oklahoma City, for defendant in error.

Osmond K. Fraenkel, of New York City, for National Lawyers Guild, amicus curiae.

Arthur Garfield Hays and Herman Rosenfeld, both of New York City, for American Civil Liberties Union, amicus curiae.

John Lee Smith, of Throckmorton, Tex., and Sam S. Gill, of Oklahoma City, for Knights of Pythias, amicus curiae.

Fred A. Tillman, of Pawhuska, and Ralph B. Gregg, of Indianapolis, Ind., for the American Legion, amicus curiae.

BAREFOOT, J. Defendant, Robert Wood, was charged in the district court of Oklahoma county jointly with a number of other defendants with the crime of criminal syndicalism, was given a severance, tried, convicted and sentenced to pay a fine of Five Thousand Dollars and serve ten years in the State Penitentiary. From this judgment and sentence he has appealed.

This is a case growing out of the same state of facts discussed in the case of Shaw v. State, decided by this court on February 17, 1943, reported in 76 Okla. Cr. 271, 134 P. 2d 999, and in which a rehearing was denied on May 19, 1943, 76 Okla. Cr. 271, 138 P. 2d 136.

Many of the questions of law involved in this appeal have been fully discussed and settled in the Shaw Case, and it will be unnecessary to lengthen this opinion by a

discussion of those questions. It will also be unnecessary to review at length the evidence, as it is fully stated in that case. The question of the validity of the information, the constitutionality of the criminal syndicalism statute, and the legality of the searches and seizures by means of which certain books and pamphlets were obtained and used as evidence against this defendant are the same as in the case against Alan Shaw.

The charge herein is different from the charge against Shaw, above referred to. In that case the charge was that Shaw did "become and was a member" of, and "assemble with", "and was * * * a member of a Society and an assemblage of persons, viz., The Communist Party," an organization "which teaches, advocates and affirmatively suggests the doctrine of criminal syndicalism," etc., without an allegation of any overt act on the part of the said Alan Shaw. Here, the defendant is not charged with the offense of being a member of this organization, but that he "did print, publish, edit, issue and knowingly circulate, sell, distribute and publicly display books, namely, to-wit: 'The Communist Manifesto,' by Marx and Engles, 'State and Revolution,' by V. T. Lenin, 'Foundations of Leninism,' by Joseph Stalin, and other books, pamphlets, papers, handbills, posters, documents and written and printed matter advocating, advising, affirmatively suggesting and teaching crime, criminal syndicalism, sabotage, the doing of acts of physical violence, the destruction and damage to property, the injury to persons and the commission of crimes and unlawful acts as a means of accomplishing, effecting and bringing about industrial and political ends and changes, and as a means of accomplishing, effecting and bringing about industrial and political revolution, contrary to the form of the statutes," etc.

The statute upon which this charge is based is section 2573, O. S. 1931, 21 O.S.A. 1941 § 1263, which is .as follows:

"Any person who, by word of mouth or writings, advocates, affirmatively suggests or teaches the duty, necessity, propriety or expediency of crime, criminal syndicalism, or sabotage, or who shall advocate, affirmatively suggest or teach the duty, necessity, propriety or expediency of doing any act of violence, the destruction of or damage to any property, the bodily injury to any person or persons, or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change, or revolution, or for profit; or who prints, publishes, edits, issues, or knowingly circulates, sells, distributes, or publicly displays any books, pamphlets, paper, handbill, poster, document, or written or printed matter in any form whatsoever, containing matter advocating, advising, affirmatively suggesting, or teaching crime, criminal syndicalism, sabotage, the doing of any act of physical violence, the destruction of or damage to any property, the injury to any person, or the commission of any crime or unlawful act as a means of accomplishing, effecting or bringing about any industrial or political ends, or change, or as a means of accomplishing, effecting or bringing about any industrial or political revolution, or for profit; or who shall openly, or at all attempt to justify by word of mouth or writing, the commission or the attempt to commit sabotage, any act of physical violence, the destruction of or damage to any property, the injury to any person or the commission of any crime or unlawful act, with the intent to exemplify, spread or teach or affirmatively suggest criminal syndicalism; or who organizes, or helps to organize or becomes a member of or voluntarily assembles with any society or assemblage of persons which teaches, advocates, or affirmatively suggests the doctrine of criminal syndicalism, sabotage, or the necessity, propriety or expediency of doing any act of physical violence or the commission of any crime or unlawful act as a means of accomplishing

or effecting any industrial or political ends, change or revolution, or for profit, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the State Penitentiary for a term not to exceed ten years, or by a fine of not more than five thousand dollars, or by both such fine and imprisonment. Provided, that none of the provisions of this act (Tit. 11, secs. 1261-1264) shall be construed to modify or affect Section 3764, Chapter 42 of the Revised Laws of Oklahoma, 1910 (Tit. 40 O.S.A. 1941, sec. 166). Laws 1919, ch. 70, p. 111, § 3."

The distinction between this case and the Shaw Case is that the Shaw and companion cases are known as the "membership" cases, and here, defendant Wood is charged with the sale and distribution of literature which it is claimed by the state was an overt act in contravention of the statute above quoted.

The evidence of the state was that officer Webb of the police department of Oklahoma City, on August 17, 1940, for the sum of 55 cents, purchased certain pamphlets from the defendant, Robert Wood, at the Progressive Book Store, located at No. 129 West Grand Avenue, in Oklahoma City, Oklahoma, as follows:

Save Your Union.
Jobs. Peace, Unity.
Must We Die?
The People's Road to Peace.
The War and the Working Class.
Ash-Can the M-Plan-The Yanks are Not Coming.
Roosevelt Heads for War.
War and the Workers.
State and Revolution.
Foundations of Leninism.
Sunday Worker, July 21, 1940.
Daily Worker, July 22, 1940.

After these pamphlets were purchased, the police officer searched the bookstore and seized about 7,000 volumes of books. Many of these books were introduced in evidence, and are part of the record. Some of them were written by purported Communists and dealt with various phases of Communist activities and were discourses by the authors relating to his or her own private conception of what the Communist party advocated and had accomplished. There were many duplicates among the 7,000 volumes. A detailed list of a great number of these books that were introduced in evidence over the objection and exception of the defendant is given in the Shaw Case. Many of them are in the public and private libraries of this country. Some of them were written as early as 1848, and long before the Bolshevik revolutions in Russia which brought radical changes in the government of that country.

In the Shaw Case we held that the admission of these books in evidence was error, for the reason that there was no evidence that they had been properly authenticated and there was no evidence that the defendant sanctioned the principles set forth in such writings; that there was no evidence that the principles enumerated in the books had been published or adopted as the principles of the organization allegedly advocated by defendant; and further that the pamphlet in evidence and styled "The Constitution and By-Laws of the Communist Party of the United States of America" failed to show that the organization was one teaching or advocating the doctrine of criminal syndicalism according to the accepted definition of that term.

Much of the opinion in the Shaw Case was with reference to the fact that there was no evidence that the alleged Communists, including the defendant herein Rob-

ert Wood, sanctioned the principles set forth in the various books, pamphlets and other literature seized by the police officers at the book store. In the instant case, the defendant is charged with circulating and distributing certain books, hereinbefore mentioned, and other books and pamphlets suggesting and teaching criminal syndicalism. This constitutes a specific charge of an overt act on the part of the defendant Wood. The evidence revealed that he had personal charge of the books, and that he did sell and distribute them. While it may be said that the possession of one book by an accused would not create any presumption against him, the possession of a great number of books, under the circumstances as here revealed, might be a circumstance against him, tending to support the charge laid in the information as to the sale, distribution and circulation of the same.

We are, therefore, of the opinion that the books were admissible in evidence against the defendant Wood. This in view of the fact that in the Shaw Case we held the statute upon which this charge is based is constitutional.

However, the statute may be constitutional, yet the officers charged with its enforcement may construe and apply it in such manner as to cause it to be unconstitutional. A literal application, as contended for by the state, would punish anyone who knowingly sells, circulates, distributes or publicly displays any book or literature advocating criminal syndicalism without regard to the intent with which the distribution, sale or display was made. If this construction is to be followed it would subject many citizens to prosecution in this state who every day sell, display and circulate the very books named in the information. In fact, in the day and age in which we now live, these very books are in demand that we may be better informed of the position, thoughts and aims of

those who are antagonistic to our thoughts and ideas, to the end that we may be better prepared to meet them with sound argument if a clash between these conflicting theories of government should arise. This statute is a good one for the protection of the citizens of this state, if given the interpretation we think was the intention of the Legislature at the time of its enactment; but if it should be interpreted in the manner contended for by the state, it would be in violation of the Constitution of the United States, as interpreted by the Supreme Court.

In the Shaw Case we discussed the principle and application of the "clear and present danger" doctrine, to which reference has so many times been made by the Supreme Court of the United States in construing statutes with reference to the applicability of the First and Fourteenth Amendments to the Federal Constitution. In the instant case, as in the Shaw Case, this issue was not presented to the jury, although a number of requested instructions were offered by the defendant, and refused by the court. The identical instruction presented and set out in the Shaw Case was here offered. There the decisions of the Supreme Court were cited and reviewed. It is unnecessary to here review them at length. We merely cite the following: Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066; De Jonge v. Oregon, 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278; Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; Stromberg v. California, 283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117, 73 A.L.R. 1484; Bridges v. California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192; Cantwell v. Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352; the concurring opinion of Justices Brandeis and Holmes in the case of Whitney v. California, 274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095; and the dissent-

ing opinion of Justices Holmes and Brandeis in the case of Gitlow v. New York, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138. See, also, Hague v. Committee for Industrial Organization, 307 U. S. 496, 59 S. Ct. 954, 83 L. Ed. 1423; Schneider v. State of New Jersey, Town of Irvington, 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155; Carlson v. California, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104; and People v. Lloyd, 304 Ill. 23, 136 N.E. 505, 512.

Since these decisions were rendered, and on June 21, 1943, the Supreme Court decided the case of Schneiderman v. United States, 63 S. Ct. 1333, 1337, 87 L. Ed. 1796. The opinion of the court was written by Justice Murphy, and Justices Douglas and Rutledge each wrote concurring opinions, and Chief Justice Stone wrote a dissenting opinion, concurred in by Justices Roberts and Frankfurter.

In that case the court was dealing with a petition filed by the Attorney General of the United States to cancel the certificate of citizenship granted in 1927 to the said Schneiderman. The act under which this was sought permitted cancellation on two grounds, first, "fraud," and second, that it was "illegally procured." The application as filed was based upon the second ground. The contention was that petitioner "was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same," but that in truth and in fact petitioner was "a member of and affiliated with and believed in and supported the principles of certain organizations known as the Communist Party of America, and the Young Communist League of America, whose principles were opposed to the principles of the Constitution of the United States, and advised, advocated and taught the overthrow

of the government, Constitution and laws of the United States by force and violence."

The evidence produced against the petitioner was very much stronger than that in the instant case against the defendant Wood. The facts are undisputed. We quote:

"Petitioner came to this country from Russia in 1907 or 1908 when he was approximately three. In 1922, at the age of sixteen, he became a charter member of the Young Workers (now Communist) League in Los Angeles and remained a member until 1929 or 1930. In 1924, at the age of eighteen, he filed his declaration of intention to become a citizen. Later in the same year or early in 1925, he became a member of the Workers Party, the predecessor of the Communist Party of the United States. That membership has continued to the present. His petition for naturalization was filed on January 18, 1927, and his certificate of citizenship was issued on June 10, 1927, by the United States District Court for the Southern District of California. He had not been arrested or subjected to censure prior to 1927, and there is nothing in the record indicating that he was ever connected with any overt illegal or violent action or with any disturbance of any sort.

" * * * As a boy he lived in Los Angeles in poverty stricken circumstances and joined the Young Workers League to study what the principles of Communism had to say about the conditions of society. He considered his membership and activities in the League and the Party during the five-year period between the ages of sixteen and twenty-one before he was naturalized, as an attempt to investigate and study the causes and reasons behind social and economic conditions. Meanwhile he was working his way through night high school and college. From 1922 to about 1925 he was 'educational director' of the League. The duties of this non-salaried position were to organize classes, open to the public, for the study of Marxist theory, to register students and to send out no-

tices for meetings; petitioner did no teaching. During 1925 and 1926 he was corresponding secretary of the Party in Los Angeles; this was a clerical, not an executive position. In 1928 he became an organizer or official spokesman for the League. His first executive position with the Party came in 1930 when he was made an organizational secretary first in California, then in Connecticut and later in Minnesota, where he was the Communist Party candidate for Governor in 1932. Since 1934 he has been a member of the Party's National Committee. At present he is secretary of the Party in California.

"Petitioner testified further that during all the time he has belonged to the League and the Party he has subscribed to the principles of those organizations. He stated that he 'believed in the essential correctness of the Marx theory as applied by the Communist Party of the United States,' that he subscribed 'to the philosophy and principles of Socialism as manifested in the writings of Lenin', and that his understanding and interpretation of the program, principles and practice of the Party since he joined 'were and are essentially the same as those enunciated' in the Party's 1938 Constitution. He denied the charges of the complaint and specifically denied that he or the Party advocated the overthrow of the Government of the United States by force and violence, and that he was not attached to the principles of the Constitution. He considered membership in the Party compatible with the obligations of American citizenship. He stated that he believed in retention of personal property for personal use but advocated social ownership of the means of production and exchange, with compensation to the owners. He believed and hoped that socialization could be achieved here by democratic processes but history showed that the ruling minority has always used force against the majority before surrendering power. By dictatorship of the proletariat petitioner meant that the 'majority of the people shall really direct their own destinies and use the instrument of the state for these truly democratic ends.' He stated that he would bear arms against his native Russia if necessary."

Two witnesses, Humphreys and Hynes, who were formerly members of the Communist Party but who had both been expelled therefrom, testified as to the principles of that party. We quote from the opinion:

"Humphreys testified that he had been a member of the Communist Party and understood he was expelled because he refused to take orders from petitioner. He had been taught that present forms of government would have to be abolished 'through the dictatorship of the proletariat' which would be established by 'a revolutionary process'. He asserted that the program of the Party was the socialization of all property without compensation. With regard to advocacy of force and violence he said: 'the Communist Party took the defensive and put the first users of force upon the capitalistic government; they claimed that the capitalistic government would resist the establishment of the Soviet system through force and violence, and that the working class would be justified in using force and violence to establish the Soviet system of society.'"

The testimony of Hynes was somewhat to the same effect:

"Hynes testified that he had been a member of the Party for eight months in 1922. He stated that the Communist method of bringing about a change in the form of government is one of force and violence; he based this statement upon: 'knowledge I have gained as a member in 1922 and from what further knowledge I have gained from reading various official publications, published and circulated by the Communist Party and from observation and actual contact with the activities of the Communist Party * * *.' On cross-examination Hynes admitted that he never attempted a philosophic analysis of the literature he read, but only read it to secure evidence, reading and underscoring those portions which, in his opinion, 'had to do with force or violence or overthrowing of this system of government other than by lawful means provided in the Constitution.' He testified that

he never saw any behavior on petitioner's part that brought him into conflict with any law.

"The testimony of the two professors discussed Marxian theory as evidenced by the writings of Marx, Engels and Lenin, and concluded that it did not advocate the use of force and violence as a method of attaining its objective."

We have stated fully the facts with reference to petitioner's connection with the Communist Party. There is no evidence in the instant case of the defendant Wood's "advocacy" of the principles of the Communist Party, but there are sufficient circumstances to find that he was a member thereof, and that he was active in the management of its affairs in this state. The evidence is that he managed or controlled the Communist book store, and that he sold the books as heretofore stated, and that the other books were taken from the store and his home. The fact that he was a member under the charges here filed, was only admissible on the question of "intent." This question was not presented to the jury by proper instructions.

The court in its opinion calls attention to the fact that it is not dealing with a naturalization proceeding where one is asking to be made a citizen of this country, but to cancel a certificate of citizenship, granted 12 years before, after a hearing in the manner provided by law, and at which a solemn judgment was rendered granting citizenship.

The court in the opinion gives a lengthy discussion of the question of Communism, and the very books mentioned in the information in this case, and many of those which were brought or seized and offered in evidence, are reviewed. The court comes to the conclusion that the evidence against the petitioner, aside from the fact that

he was a member of the Communist Party and participated in its activities, did not reveal that he believed in and advocated the employment of force or violence, instead of peaceful persuasion, as a means of attaining political ends.

With reference to the Constitution of the Communist Party in 1938, the court says:

"The 1938 Constitution of the Communist Party of the United States, which petitioner claimed to be the first and only written constitution ever officially adopted by the Party and which he asserted enunciated the principles of the Party as he understood them from the beginning of his membership, ostensibly eschews resort to force and violence as an element of Party tactics."

A copy of this Constitution was introduced in evidence by the state in the instant case, and is a part of the record. It reads, in part:

"Article X, Section 5. Party members found to be strike-breakers, degenerates, habitual drunkards, betrayers of Party confidence, provocateurs, advocates of terrorism and violence as a method of Party procedure, or members whose actions are detrimental to the Party and the working class, shall be summarily dismissed from positions of responsibility, expelled from the Party and exposed before the general public."

If the defendant is to be punished by reason of his membership in the Communist party, the principles of the party in 1941, at the time of the charge against him, should be considered, and this was governed by the constitution of 1938, by the terms of which the Supreme Court said that it did not advocate the overthrow of the government by force and violence. However, we are not passing upon that question, but only that the issue of clear and present danger should have been submitted to the jury, as requested by the defendant.

320

The court discusses the "clear and imminent danger" doctrine, to which reference has heretofore been made, and which was discussed by this court in the Shaw Case. It says:

"There is a material difference between agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil, and mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time—prediction that is not calculated or intended to be presently acted upon, thus leaving opportunity for general discussion and the calm processes of thought and reason. Cf. Bridges v. California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192, and Justice Brandeis' concurring opinion in Whitney v. California, 274 U. S. 357, 372-380, 47 S. Ct. 641, 647-650, 71 L. Ed. 1095 [1104-1108]. See also Taylor v. Mississippi, 319 U. S. 583, 63 S. Ct. 1200, 87 L. Ed. 1600, this term. Because of this difference we may assume that Congress intended, by the general test of 'attachment' in the 1906 Act, to deny naturalization to persons falling into the first category but not to those in the second. Such a construction of the statute is to be favored because it preserves for novitiates as well as citizens the full benefit of that freedom of thought which is a fundamental feature of our political institutions. Under the conflicting evidence in this case we cannot say that the Government has proved by such a preponderance of the evidence that the issue is not in doubt, that the attitude of the Communist Party of the United States in 1927 towards force and violence was not susceptible of classification in the second category. Petitioner testified that he subscribed to this interpretation of Party principles when he was naturalized, and nothing in his conduct is inconsistent with that testimony. We conclude that the Government has not carried its burden of proving by 'clear, unequivocal, and convincing' evidence which does not leave 'the issue in doubt', that petitioner obtained his citizenship illegally. In so holding we do not decide what

interpretation of the Party's attitude toward force and violence is the most probable on the basis of the present record, or that petitioner's testimony is acceptable at face value. We hold only that where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a denaturalization proceeding, assuming that it can re-examine a finding of attachment upon a charge of illegal procurement, *is not justified in canceling a certificate of citizenship by imputing the reprehensible interpretation to a member of the organization in the absence of overt acts indicating that such was his interpretation.* So uncertain a chain of proof does not add up to the requisite 'clear, unequivocal, and convincing' evidence for setting aside a naturalization decree. Were the law otherwise, valuable rights would rest upon a slender reed, and the security of the status of our naturalized citizens might depend in considerable degree upon the political temper of majority thought and the stresses of the times. Those are consequences foreign to the best traditions of this nation, and the characteristics of our institutions."

We have quoted at length from the Schneiderman Case because it has been decided by the Supreme Court of the United States since the opinion in the Shaw Case was rendered by this court. A reading of the opinion reveals that many of the thoughts expressed by this court are clearly upheld in that case. It again reaffirms the "clear and present danger" doctrine, as shown by the quotation above set forth. It also points out that there was a decided change in the principles of the Communist Party after 1927, the time considered by the court in that case, and the principles announced by the party in the constitution of 1938, under which the party was acting at the time of the charge preferred against this defendant.

The only books mentioned in the information and which were alleged to have been sold and distributed by the defendant Wood were the ones relied upon by the government in the Schneiderman Case to prove that he was not attached to the Constitution or government, because he believed in the use of force or violence instead of peaceful democratic methods to achieve his desires. Yet, after a consideration of these books and documents, the Supreme Court, in what might be termed a quasi civil proceeding, came to the conclusion that "under the conflicting evidence in this case we cannot say that the government has proved by such a preponderance of the evidence that the issue is not in doubt, that the attitude of the Communist Party of the United States in 1927 towards force and violence was not susceptible of classification in the second category." Yet in the instant case, defendant was charged with the violation of a criminal statute, which demanded proof of his guilt beyond a reasonable doubt before he could be convicted. There was not a line of proof in the instant case interpreting the books which this defendant sold, or giving the principles of the Communist Party at the time defendant was charged. Nor was there any evidence that defendant advocated or believed in the principles or doctrines of the authors of the books which he sold to officer Webb, or that were sold in the bookstore, or found in his home. The question of "clear and imminent danger" was not submitted to the jury, and an instruction to this effect which is quoted in the Shaw Case was refused by the court.

On June 14, 1943, and since the decision in the Shaw Case, the Supreme Court of the United States has also decided the cases of Taylor v. Mississippi, Benoit v. Mississippi, and Cummings v. Mississippi, 63 S. Ct. 1200, 87 L. Ed. 1600, all being appealed from the Supreme Court of

Mississippi. These cases involved the validity of a statute with reference to saluting the American Flag. The statute is somewhat similar to our Criminal Syndicalism statute. We quote it as follows:

"That any person who individually, or as a member of any organization, association, or otherwise, shall intentionally preach, teach, or disseminate any teachings, creed, theory, or set of alleged principles, orally, or by means of a phonograph or other contrivance of any kind or nature, or by any other means or method, or by the distribution of any sort of literature, or written or printed matter, designed and calculated to encourage violence, sabotage, or disloyalty to the government of the United States, or state of Mississippi, or who by action or speech, advocates the cause of the enemies of the United States or who gives information as to the military operations, or plans of defense or military secrets of the nation or this state, by speech, letter, map or picture which would incite any sort of racial distrust, disorder, prejudices or hatreds, or which reasonably tends to create an attitude of stubborn refusal to salute, honor or respect the flag or government of the United States, or of the state of Mississippi, shall be guilty of a felony and punished by imprisonment in the State penitentiary until treaty of peace be declared by the United States but such imprisonment shall not exceed ten years." Laws Miss. 1942, c. 178.

These defendants were indicted for disseminating and distribution of literature and printed matter contrary to the statutes above quoted. The cases were reversed in an opinion by Justice Roberts, in conformity with the decision of West Virginia State Board of Education v. Barnette, 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628, decided at the October, 1942, term of the court.

In the concluding paragraphs of the opinion in the Taylor case [319 U. S. 624, 63 S. Ct. 1204, 87 L. Ed. 1628], the court says:

"The statute as construed in these cases makes it a criminal offense to communicate to others views and opinions respecting governmental policies, and prophecies concerning the future of our own and other nations. As applied to the appellants it punishes them although what they communicated is not claimed or shown to have been done with an evil or sinister purpose, to have advocated or incited subversive action against the nation or state, or to have threatened any clear and present danger to our institutions or our government. What these appellants communicated were their beliefs and opinions concerning domestic measures and trends in national and world affairs.

"Under our decisions criminal sanctions cannot be imposed for such communication."

The state in its brief in this case cites and relies upon the case of Gitlow v. New York, supra, and Whitney v. California, supra.

We have carefully read and re-read these cases. Insofar as the Gitlow Case is concerned upon the question of a "clear and imminent danger" being necessary, the court, in our opinion, sustains the proposition that it is not necessary that there be a "clear and imminent danger", that the act done would constitute a destruction or overthrow of the existing government by force and violence. Some of the cases have attempted to distinguish its terms by referring to the fact that the record reveals that at the time in question there existed "a clear and imminent danger." But our impression of the case is that it did not recognize this right. However, the dissenting opinion by Justice Holmes, concurred in by Justice Brandeis, did clearly recognize this right. He said [268 U. S. 652, 45 S. Ct. 632, 69 L. Ed. 1138]:

"Mr. Justice Brandeis and I are of opinion that this judgment should be reversed. The general principle of free speech, it seems to me, must be taken to be included

in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States. If I am right then I think that the criterion sanctioned by the full Court in Schenck v. United States, 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470, [473], applies: 'The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that (the state) has a right to prevent.' It is true that in my opinion this criterion was departed from in Abrams v. United States, 250 U. S. 616, 40 S. Ct. 17, 63 L. Ed. 1173, but the convictions that I expressed in that case are too deep for it to be possible for me as yet to believe that it and Schaefer v. United States, 251 U. S. 466, 40 S. Ct. 259, 64 L. Ed. 360, have settled the law. If what I think the correct test is applied, it is manifest that there was no present danger of an attempt to overthrow the government by force on the part of the admittedly small minority who shared the defendant's views. It is said that this manifesto was more than a theory, that it was an incitement. Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason. But whatever may be thought of the redundant discourse before us, it had no chance of starting a present conflagration. If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way.

"If the publication of this document had been laid as an attempt to induce an uprising against government

at once and not at some indefinite time in the future it would have presented a different question. The object would have been one with which the law might deal, subject to the doubt whether there was any danger that the publication could produce any result, or in other words, whether it was not futile and too remote from possible consequences. But the indictment alleges the publication and nothing more."

In the Whitney Case Justice Brandeis wrote what is labelled a concurring opinion, since he agreed to an affirmance of the case by reason of a technical practice, but his opinion is a strong dissent from the principles announced in the majority opinion, and he again expresses the views of himself and Justice Holmes, who concurs, as to the necessity of the "clear and imminent danger" doctrine, when he said [274 U. S. 357, 47 S. Ct. 648, 71 L. Ed. 1095]:

"To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. * * * But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated."

It will be noted that in the Whitney Case, defendant did not raise the question that there "was no clear and present danger of serious evil." Nor did she request that

the existence of these conditions of a valid measure thus restricting the rights of free speech and assembly be passed upon by the court or a jury. In the instant case, as has heretofore been stated, a requested instruction to this effect was presented to the trial court, and refused.

The cases decided by the Supreme Court of the United States since the decisions in the Gitlow and Whitney Cases, most of which have heretofore been cited, have modified and overruled the principles announced in those cases, and have adhered to the principles announced in the dissenting opinions of Justices Holmes and Brandeis, as applied to the "clear and present danger" doctrine. Herndon v. Lowry, supra.; Hague v. C. I. O., supra; Schneider v. State of New Jersey, Town of Irvington, supra; Thornhill v. Alabama, supra; Carlson v. California, supra.; Schneiderman v. United States, supra.; Taylor v. Mississippi, supra; West Virginia State Board of Education v. Barnette, supra.

From a reading of the opinions of the Supreme Court of the United States, it may be noted that they have been very jealous of their expressions concerning any activity which had a tendency to infringe upon the freedom of speech or of the press. Lovell v. Griffin, 303 U. S. 444, 58 S. Ct. 666, 82 L. Ed. 949; Grosjean v. American Press Co., 297 U. S. 233, 56 S. Ct. 444, 80 L. Ed. 660; Schneider v. State, supra.

As we have so often stated, it is the highest court in the land. Its decisions considering the applicability of state statutes to the terms of the Constitution of the United States are final and have and will be followed by this court. Lyons v. State, 76 Okla. Cr. 41, 133 P. 2d 898; Pendley v. State, 76 Okla. Cr. 41, 141 P. 2d 118;

Gore v. State, 24 Okla. Cr. 394, 218 P. 545; McCord v. State, 2 Okla. Cr. 209, 101 P. 135.

From these opinions we find the rule announced that in the field of legislation there is a general rule that acts of the Legislature will be presumed to be constitutional, and it must be shown that the state has abused its power before the same will be declared unconstitutional. But there is an exception to the rule, when the right of freedom of speech or of the press, or of religious worship is involved, and when these questions are raised the burden is upon the state of justifying its application in each instance. In carrying out this principle, it has been thought necessary, before utterances may be penalized, justification must be found in a reasonable apprehension of danger to our government.

The limitation upon individual liberty must have appropriate relation to the safety of the state. When the legislative act exceeds this need, the principles of constitutional freedom are violated. As applied to the case at bar, the statute may be perfectly regular on its face and reveal no constitutional defects but if its application is such that one is deprived of personal constitutional liberties, a conviction must be set aside as violative of due process. De Jonge v. Oregon, supra; Herndon v. Lowry, supra; Schneider v. State of New Jersey, Town of Irvington, supra.

It cannot be doubted but that the application placed upon the statute under consideration, by the instructions given, and the refusal to give the instructions requested by the defendant, constituted an abridgment of the rights guaranteed by the 14th Amendment to the Constitution of the United States.

Under the instructions of the trial court, a conviction was proper under the statute if the jury found that the defendant had sold or displayed the books in question, and they further found that these books contained language which in the jury's opinion advocated force and violence. This, without proof that the defendant advocated what was in the books, or that there was present a "clear and present danger" by the disbursing of the same. This construction and application of the statute amounted to holding that anyone who at any time and for any reason displayed or sold books of this character is presumed to have advocated the doctrines therein announced. Under this construction, any bookstore owner or manager, or librarian selling or circulating such a book would be guilty of violation of the statute. We cannot feel that this application and construction was intended by the Legislature of this state at the time of the enactment of the act. If it is to be so construed, it comes in direct conflict with the provisions of the Federal Constitution which guarantees freedom of speech and of the press, as construed by the many decisions of the Supreme Court of the United States. By the denial of the requested instructions, the jury was not given an opportunity to pass upon the issues above mentioned. This was clearly error, and denial of a fundamental right.

The brief of the state filed in this case is a strong denunciation of the principles of the Communist Party. The arguments made before the jury by the county attorney, and the assistant county attorney are a part of the record. They are assigned as one of the errors in the case. It is unnecessary for us to pass upon these issues, or to even mention them. Our personal opinions are not here involved. Courts are the ultimate resorts for the vindication of the Bill of Rights. These constitu-

tional questions must be solved by a careful and dispassionate consideration of the facts presented in each case, wholly without consideration of extrajudicial matter. The final question is, did the defendant have that fair and impartial trial to which he was entitled under the Constitution and laws? If he did not have this, then justice demands that it be given him.

It is our conclusion that the failure of the court to submit by proper instructions the question as to whether defendant had an unlawful intent to bring about an industrial or political change in our government by unlawful means, in the sale, displaying and circulation of the literature in question, was an error which materially prejudiced the rights of the defendant and constituted an unconstitutional application of the statute. Further, as has been heretofore pointed out, the court should have instructed the jury that they must find beyond a reasonable doubt not only that defendant knowingly sold and distributed the literature advocating criminal syndicalism as charged in the information with an unlawful intent, but that they must further find that the selling, publicly displaying, and distributing of said literature by defendant was reasonably likely to result within the immediate future, in the commission of crime, serious violence, or other unlawful acts for the purpose of bringing about political or industrial change or revolution by such methods. The jury under the instructions of the court was not permitted to pass upon these issues.

For the reasons above stated, the judgment and sentence of the district court of Oklahoma county is reversed, and the case remanded.

JONES, P. J., concurs. DOYLE, J., dissents.